(No. 17711.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. CHARLES TRIMM et al. Plaintiffs in Error.

*Opinion filed December 23, 1926.*

CRIMINAL LAW—*court should hear evidence as to admissibility of alleged confessions.* Where objection is made to the receiving in evidence of alleged confessions of defendants, it is the duty of the court to hear, out of the presence of the jury, such evidence as either side offers as to the circumstances under which the confessions were made, to determine whether or not they were voluntary.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM M. GEMMILL, Judge, presiding.

A. L. WILLIAMS, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and VIRGIL L. BLANDING, (EDWARD E. WILSON, HENRY T. CHACE, JR., and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

March 8, 1926, Leroy Bosley, Charles Trimm (alias John Wilson) and Dewitt Fly were tried in the criminal court of Cook county upon an indictment charging them with the robbery of Wilbur Waters on the 15th day of December, 1925, while armed with a revolver. While the trial was in progress Bosley withdrew his plea of not guilty, plead guilty and turned State's evidence. The jury returned a verdict finding Trimm and Fly guilty of robbery while armed. Motions for a new trial and in arrest of judgment were made and overruled and judgment entered in accordance with the verdict.

Cato Morris lived in a flat at 209 East Forty-fourth street, in Chicago, which place the evidence tends to show

was a place for unlawful and immoral practices. Janet
Ford was his housekeeper, and there were two roomers,
named Gray and Price. On December 15, 1925, about one
o'clock P. M. the three defendants below called at the Mor-
ris flat, where they found Morris, Janet Ford and another
woman. Soon thereafter Waters came in. The parties all
remained in the flat two or three hours. There is evidence
that there had been drinking and card playing, and that
Trimm drew a gun, ordering the occupants of the flat to
raise their hands, and that he and his co-defendants went
through the pockets of those present, relieving them of their
jewelry, money and a gun, and that they then went into
the front room, broke open a trunk, tied the hands and feet
of the four parties present and then left the flat. The de-
fendants were soon afterwards arrested at the home of Fly,
where the various articles charged to have been taken at
the time of the robbery were found upon Trimm and Fly
by the police. An altercation ensued between the defend-
ants and the police officers, during which, according to the
testimony of one of the police officers, Trimm had hit the
third-story window and the officer "pushed him through
the window, where he fell to the ground." Fly was shot
but not severely wounded. Plaintiffs in error admitted that
they were in the flat at the time in question, but claimed
that they won the money, jewelry and gun in a crap game
which was participated in by all the parties.

It is contended by plaintiffs in error that the attitude
of the court, as manifested by remarks made in the pres-
ence of the jury during the trial and by rulings on the ad-
mission of evidence, was such as to indicate to the jury
the opinion that plaintiffs in error were guilty, and that
thereby they were prejudiced and prevented from having a
fair and impartial trial.

Plaintiffs in error were first tried upon an indictment
charging them with robbing Morris and were acquitted upon
that charge. Upon the trial of the present case, after the

jury had been impaneled and the opening statements made
but before any evidence had been heard, the following col-
loquy ensued:

The court: "This was one transaction?

Mr. Levin (assistant State's attorney): "Yes, your
honor.

Mr. Williams (defendants' attorney): "Then, your
honor, I move that a plea of former jeopardy—your
honor, I would like to make a motion so that the record
will be clear.

The court: "Go ahead.

Mr. Williams: "Now, your honor, the motion I want—
the statement I want in the record—

The court: "This is no time for a statement.

Mr. Williams: "Then I want to enter the plea of *autre-
fois acquit* as to my clients' former jeopardy.

The court: "What book did you get that out of?

Mr. Williams: "Law book—because I think this case
would justify a deep consideration of this court before
these boys should be compelled to be tried in this case again,
and especially after the position we have been placed in this
morning. During all my experience—

The court: "Wait a minute; your experience is not as
old as mine. Well, now, the jury may as well know the
facts. As I understand from counsel here, he desires to
raise the question of former jeopardy. It merely raises
the question whether or not these defendants have been be-
fore placed in jeopardy for this crime. The law is that a
man cannot be twice placed on trial for the same offense,
so counsel is raising the question here whether or not these
defendants are being placed in jeopardy by a second trial.
I get it from counsel that there was another trial. These
two men were charged in another case of holding up an-
other man. It is charged that they held up two men at the
same time and that it was the same transaction. They had
a trial as to one of these men. That trial was had before

a jury in another court room and that jury found defend-
ants not guilty in that case.   Now, because the evidence in
this case would be substantially the same, the facts being
the same except the person being different, therefore these
defendants were in former jeopardy and you cannot again
try them for this offense.   That raises purely a legal ques-
tion as to whether they were in former jeopardy.   I am
convinced they were not in former jeopardy.   As a matter
of law, the fact that these men were tried for holding up
one man and found not guilty does not bar the trial on the
charge of holding up the other, and the finding not guilty
in one case does not bar the trial for the other.   I will over-
rule counsel's motion."

The attorney for the plaintiffs in error on the cross-
examination of one of the police officers asked him a ques-
tion to which no objection was made, and the following
colloquy ensued:

The court: "That is not material; let's get along.

Mr. Williams: "If I can't ask him question—I can't
try witnesses in a minute.

The court: "We are going through this morning.

Mr. Williams: "We'll, if—

The court: "If you are going to ask a question ask it
now, and no more back talk."

After the State had rested its case in chief without call-
ing as a witness Cato Morris, whom the evidence showed
to have been present during the entire transaction, plaintiffs
in error's attorney asked the court to have Morris called
as the court's witness, to which the court replied, "The court
is not calling any witness; you are calling the witness."
Thereupon Morris was called and sworn as a witness, and
after he had replied to a certain question propounded to
him by plaintiffs in error's attorney the following took
place:

Mr. Williams: "Well, at this time, from the last answer
he made, I am surprised.

The court: "No, you are not surprised at the witness at all. You knew this witness was against you when you put him on the stand. You knew that in advance."

After one of plaintiffs in error had testified for the defense, the assistant State's attorney, over the objection of plaintiffs in error, was allowed to call Bosley to the stand as a witness, whereupon the following took place:

The court: "Do you want to plead guilty in this case?

A. "Yes, sir.

Q. "And do you want to testify, do you?

A. "Yes, sir.

Q. "You understand, all we want you to do is to tell the truth. All we want to know is the truth. It is your desire to plead guilty. You have talked with your lawyer and you now take the stand and testify to the truth in this case. Is that right?

A. "Yes.

Q. "I ask you now, in the presence of everybody, do you want to withdraw your plea of not guilty, enter a plea of guilty, take the stand and tell the truth, free and voluntary, without promise of reward?

A. "Yes.

Mr. Williams: "I object.

The court: "Wait. You will have a chance to cross-examine him."

On cross-examination Bosley testified that since court adjourned in the morning he had had a conversation with his attorney in the county jail and this question was asked him, "What did he tell you in the county jail?" The assistant State's attorney objected, and the court said: "What are you asking him for—fiduciary relations? Sustained."

After Bosley had been cross-examined for some considerable time and asked about all the details of the transaction in question by plaintiffs in error's attorney, the following took place:

The court: "Your cross-examination has not been to the point.

Mr. Williams: "Do I understand the court to say we don't know what we are doing?

The court: "You certainly do not.

Mr. Williams: "I take exceptions to the remarks of the court."

At a later period in the case the following took place:

The court: "Mr. Williams, you told this court that you have got a lot of evidence. If you have got any, put it on.

Mr. Williams: "Well, she is the only witness in this particular transaction.

The court: "If you are through, say so; if you are not, say so. Are you through?

Mr. Williams: "That is all as far as I can go as to this transaction.

The court: "Are you through?

Mr. Williams: "I am through.

The court: "No; no; are you through?"

Certain confessions alleged to have been made by plaintiffs in error were introduced in evidence. Prior to their admission in evidence the attorney for plaintiffs in error represented to the court that the alleged statements were obtained by force and violence on the part of the police and asked the court to excuse the jury and consider evidence as to whether or not such confessions were voluntarily made. This the court refused to do and the statements were then read into the record. Where objection is made to the receiving in evidence of confessions of defendants it is the duty of the court to hear, out of the presence of the jury, such evidence as either side offers as to the circumstances under which the confessions were made, with a view to determine whether or not they were voluntary. *Bartley* v. *People,* 156 Ill. 234; *Zuckerman* v. *People,* 213 id. 114; *People* v. *Rogers,* 303 id. 578; *People* v. *Sweeney,* 304 id. 502; *People* v. *Fox,* 319 id. 606; *People* v. *Costello,*

320 id. 79; *People* v. *Berardi,* 321 id. 47; *People* v. *Guido,* 321 id. 397.

It can subserve no good purpose to secure a record number of convictions if, in order to secure the same, error must be committed and well recognized rules of law violated, necessitating reversal by a court of review. Prosecutors and judges who desire not only that criminals should be convicted but also punished for their crimes should carefully guard against error instead of injecting reversible error into the record.

For the manifest error in this record the judgment of the criminal court of Cook county is reversed and the cause remanded.

*Reversed and remanded.*