(No. 30237.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALBERT LEE THOMLISON *et al.*—(ROBERT LEE KARRICK, Plaintiff in Error.)

*Opinion filed September 24, 1948.*

556

SIMPSON, J., took no part.

FRANCIS J. MANNING, of Wood River, and JACOBY, PATTON, MANNS & COPPINGER, of Alton, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, of Springfield, and C. W. BURTON, State's Attorney, of Edwardsville, (A. AUSTIN LEWIS, of Granite City, and KENNETH F. KELLY, of Alton, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

Robert Lee Karrick and Albert Lee Thomlison were indicted for the crime of robbery in the circuit court of Madison County, tried before a jury, found guilty, and

sentenced to the penitentiary. Robert Lee Karrick alone has prosecuted a writ of error to this court.

The indictment was returned in January, 1947, charging that the robbery had been committed November 7, 1945. The evidence shows that one Henry Schneehage was robbed on the morning of November 7, 1945. He had just started to drive to his tavern in Alton, a few minutes after 5 A.M., and as he started the car into the road somebody from the back seat of the car pressed something, which he assumed to be a gun barrel, to the back of his neck and told him to keep going. After driving about a half mile he was told to hand over the sack in which he carried the money. The person then got out of the car and into another car behind Schneehage, and "they followed me for some time." It was dark and he did not see the man's face, and could not recognize him or the car following, nor did he recognize or identify Robert Lee Karrick as one of the robbers; and said he assumed it was a gun barrel pressed to his neck because he could feel the hole in it.

Something over a year afterwards Thomlison was arrested, and on December 3, 1946, plaintiff in error, Karrick, was arrested on a warrant in Chicago by the sheriff of Madison County, brought to Alton, turned over to the police, and the next day signed a confession, which the People claimed to be voluntary; and was tried and convicted upon this alleged confession. There was substantially no other evidence in the case.

The plaintiff in error claims the confession was not voluntary, and was extorted by brutality of the police on the evening of December 3, 1946. The evidence of Karrick discloses he was arrested in Chicago by the sheriff of Madison County, on a warrant issued by a justice of the peace of Alton township, and was brought back to Alton. He was not taken before the justice of the peace, as required by statute, (Ill. Rev. Stat. 1947, chap. 38, par. 673-

679; *People* v. *Frugoli,* 334 Ill. 324,) nor was he taken to the county jail, where the statute required him to be kept before preliminary hearing or trial, but was delivered to the police in Alton, without any authority other than their request.

At the time Karrick was delivered to the police he had no wounds or bruises on his face, neck or mouth. Both the sheriff and his deputy agree to this. Upon delivery at the police station Karrick was first placed in a cell, and later taken to a room back of the sergeant's desk. The chief of police, Barkley, and policeman Austin sat down on each side of him and asked if he remembered anything about December 6 or 7, 1945. He said he did not, and if he was being accused of implication in that robbery he was not guilty, and would like to have an attorney or somebody see him. Karrick's testimony from there on is as follows: "The chief said I would see no attorney or anyone else until I gave them what they wanted. Austin hit me in the mouth. The chief said Thomlison had confessed and implicated me, and said 'you are going to do the same,' and started beating me with his fists. This went on for about two hours and I could hardly stand it; my eyes were blackened, my lips split, three teeth knocked loose, my temple bruised, and my neck red and swollen and I could hardly stand it. Once my head dropped down, and one of them grabbed me by the hair and hit me in the throat. I told Austin he had knocked my bridgework loose, and he replied 'I will knock your whole God damn teeth out.' After being beaten I finally said I would confess to murder or anything if they wanted me to. Barkley, the chief, then indicated exactly how he wanted my confession to read, and after talking with me told me what to put in exhibit 2. There was nobody present at this meeting on the evening of December 3rd except Austin and Barkley. The next morning I was taken before Lieut. Waller, and told him as much as I could remember of what Chief

Barkley had told me to say, and when I forgot a part of it Waller reminded me of it. The words were those of Lieut. Waller, but I signed it. I said nothing then about the beating. I was so shaken up, and in such condition I did not know all that was going on. It took me an hour to sign all of the different places."

The foregoing is the substance of Karrick's testimony both in the preliminary hearing on the confession and also upon the witness stand in his own defense. The evidence of six witnesses positively shows that on December 5, nearly forty-eight hours after his first incarceration, his eyes were discolored, his teeth loose, face bruised, lips split, and other contusions upon the neck and face. This was his physical condition after the voluntary confession. We can only conjecture his mental condition. It is true Austin denies this brutal assault upon Karrick, and Barkley says he did not strike him, but he did not know what the other officers did. Waller says he saw a bruise on his left eye, but did not notice any other, but that Karrick had said he had bumped his head against a door. The evidence of the witnesses to the confession of December 4, four in number, was rather inconclusive. Hawkins, a justice of the peace, said he did not notice any bruises; Smothers stated there were no bruises to his knowledge; Duffy did not see a black eye; and Barkley said there was no force used then, (meaning at the time the paper was signed,) December 4, and said none was used by him on the day before. All four of these witnesses concur in saying there was no force used at the time of the confession on December 4, and Karrick expressly says there was no force used at that time. Barkley and Austin do not deny Karrick wanted a lawyer, nor the separate session the night of December 3.

From these facts the court found the confession of December 4 was voluntary. Apparently the basis for this ruling was that what had taken place in the cell on the

evening of December 3 had no connection or effect upon the confession made in the police office on December 4. However, Barkley, the chief of police, also testified that Karrick the evening before admitted he was connected with the robbery, so as a matter of fact the testimony shows that the police officers relied upon a confession started on the evening of December 3 and consummated the next morning before other witnesses. Austin was not called upon as a witness until rebuttal of Karrick's testimony in his own behalf, and there were other policemen around the station whose names are not designated, who were not offered as witnesses.

The evidence upon the question of violence used toward the defendant consists of that of a photographer who took a picture; of his mother who was outside, and had been in Alton awaiting his arrival, with an attorney; his brother; his brother's wife; his aunt, and his stepfather. A fair example of the testimony of these witnesses is substantially as follows: "When I first saw him I was shocked. His left eye was pretty near shut and very bruised and swollen. It was black. And his other eye was black and swollen too but not as bad as the left. On the side of his face was a bruise where the hide had been removed. Some hide had been removed from the other side too. His lip was swollen larger than normal." The testimony of the other witnesses was substantially the same. This evidence is positive compared with the inconclusive and evasive testimony of the four witnesses to the December 4 confession.

The principal question is whether the State established the confession of Karrick was voluntary. From the recital above it will be seen that the People confined their proof to what happened on December 4, in the presence of several officers who had no part in the assault. It has given but little attention to what occurred the evening and night of December 3 and what its effect would be upon the con-

fession on the following day. If it is lawful to extract a confession by brutality and violence by one set of officers in the night, and then the next day have the defendant repeat the confession in the presence of other officers not participating in the violence, then the confession upon which he was convicted was voluntary.

Whether a previous assault resulting in a confession has an effect upon the character of a subsequent confession is the principal question in this case. Confessions extorted by violence, brutality, promise, or unlawful confinement for an unreasonable length of time are illegal, and may not be offered or received in evidence against the accused. A voluntary or freely made confession of guilt is proper evidence of a high and convincing character. The duty devolves upon the trial court to determine whether the confession is voluntary, and this is usually determined by hearing the evidence on such question out of the presence of the jury. We have held that all of the witnesses to the confession, or those taking a part in obtaining it, must be produced. The burden is upon the State to show the confession is voluntary. The facts show that Karrick was delivered uninjured to the police of Alton the night of December 3, and on the next day was produced before the committee of witnesses, bruised, eyes discolored, face bruised, and contusions, teeth loose, and with other evidences of brutality. Karrick weighed 135 pounds, Austin 240 pounds and Barkley 180 pounds. The production of Karrick in this condition by the police after one night's interview with them, requires something more than the mere denial of the assaulting officers and the denial of others that they saw anything.

Since the burden of proving by a preponderance of the evidence that confession is voluntary is on the State, the appearance of the defendant in the condition he was in requires clear and convincing proof that this condition was not produced by the actions of the police officers, and

that it had nothing whatever to do with a confession made later on. Lieut. Waller explained that the defendant told him he had run into a door. This is not convincing, as jail doors are usually closed, and it would be an unusual collision that could produce the result described, unless contact with the door was helped to a certain extent by a large policeman. Karrick's condition is strongly corroborative of his story as to what happened ·on the night of December 3. He is not disputed by anyone but Austin, as the other State witnesses did not notice his condition, or did not see it, or limited it to what they·saw on December 4, when the confession was written by Lieut. Waller, and signed by the defendant and the witnesses.

We are of the opinion there is little question but that Karrick was brutally assaulted upon the night of December 3, and if such beating was a contributing factor to the written confession, the question arises as to whether the later confession was admissible in evidence. We have held that all of the facts surrounding the obtaining of a confession may be shown as an aid to determine whether the confession of the prisoner was voluntary or otherwise. *People* v. *Crabb,* 372 Ill. 347.

The constitution of the State of Illinois provides that no one shall be required to give evidence against himself in a criminal case. (Art. II, sec. 10.) It also provides that no person shall be deprived of life, liberty, or property without due process of law. (Art. II, sec. 2.) And likewise, the fourteenth amendment to the constitution of the United States provides that no State "shall deprive any person of life, liberty or property without due process of law; nor deny any person within its jurisdiction the equal protection of the laws."

In *People* v. *Holick,* 337 Ill. 333, we held that a confession was not voluntary if any degree of influence amounting to duress was used. And in *People* v. *Goldblatt,* 383 Ill. 176, we said: "A confession is regarded as voluntary

when it is made of the free will and accord of the accused without fear of any threat of harm or without promise or inducement by hope of reward," and, quoting from *People* v. *Vinci,* 295 Ill. 419, we further said "we do not want to be understood, however, as approving the practice of taking into custody and detaining persons merely suspected of crime for the purpose of getting confessions from them. Such practice deserves the severest censure and it has been repeatedly condemned by the courts of this country."

We must consider now what effect the involuntary confession of the night of December 3 had upon the confession that was offered in evidence, which was made the following day, and which took some four or five hours for the police officer to write. Stress is placed upon the fact that the whole history of the defendant's life is included in this confession. It was the kind insisted upon by the officer. Its obvious purpose was to make it a convincing document, because much of it related to events of Karrick's life not bearing upon the crime. The State's Attorney stressed this fact as tending to prove the truth of every fact. The answer to this proposition is that this was required by the police, and was mapped out by them the night before, and this fact is not denied by the officers, nor is it denied by Austin, who was present at the time. The attitude of Lieut. Waller indicates he insisted upon, and himself wrote, all of these details after interrogation, and it is not disputed that from time to time he prompted Karrick as to what he had said the night before. The surrounding circumstances show that Karrick was delivered to the police station before he was taken before a justice of the peace; that his mother was present on the outside; that he was denied an interview with her or a lawyer; and if the confession obtained the night before by fear and brutality did not influence what he said the next day, still in the presence of three or four police officers, he would be a most unusual person.

We find support for this view. In *People* v. *Santucci,* 374 Ill. 395, police officers prior to his arrest assaulted the defendant, without making any charge, and when later he was arrested and had made a so-called voluntary statement the court held that the assault and confession were so closely related that it could not be deemed voluntary. We commented thus: "After such abuse by policemen when they had no charge against him, it is obvious defendant would in all probability be afraid to invite the hostility and wrath of the officers by insisting he was innocent when arrested on the robbery charge," and for this reason held that the confession was not admissible.

There is little difference between the situation in the *Santucci case* and the present one, except in the former the defendant was at large for a day or two, but was presumed to be under the influence of the officers at the time he made the incriminating statement. The overshadowing fear would be much greater in the case of Karrick, who had been subjected to the assault in question a good part of the night, and then called before the police officers the following day. Quite similar is *People* v. *Crabb,* 372 Ill. 347, where similar acts were held an abuse of process by the officers. The illegal detention, constant grilling and refusal to permit the defendant to talk with parents or counsel was relevant on the question whether the confession was voluntary.

The decisions of the Supreme Court of the United States have construed the due-process clause of the constitution of the United States to forbid forced confessions, when used in both the Federal and State courts, and it is necessary that these cases so construing the fourteenth amendment be considered in the present case, since the constitution of the United States is the supreme law of the land.

The United States Supreme Court has held beyond any question that a State deprives a prisoner of due process of

law when it obtains a confession of guilt from such prisoner by force, or violence, or brutality, or by incessant questioning, or by any other method commonly known as the "third degree," and has used forceful and emphatic language in condemning the practice. A line of cases commencing with *Brown* v. *Mississippi*, 297 U.S. 278, 80 L. ed. 683, and ending with *Haley* v. *Ohio*, No. 51 October term, 1947, has reversed cases in State courts because of the improper admission of a confession claimed to be voluntary, which was in fact involuntary. *Lyons* v. *Oklahoma*, 322 U.S. 596; *Malinski* v. *New York*, 324 U.S. 401, and other cases cited in note to *Lee* v. *Mississippi*, 92 L. ed. 315.

The *Brown case* (opinion rendered by Justice Hughes) is the pioneer in condemning forced confessions, and in reversing judgments of the State courts because such practice denies due process of law. In these cases also the court held that the duty of maintaining constitutional rights of the person on trial rises above rules of State procedure, and such court will refuse to sustain procedural practices of the State courts which permit convictions upon involuntary confessions. In other words, these cases require the State courts to give a prisoner due process of law in accordance with the views of the Supreme Court of the United States.

In the *Brown case,* where the confession was obtained by brutality, the defendant convicted, and the conviction affirmed in the State Supreme court, the court said: "The State may abolish trial by jury. It may dispense with indictment by a grand jury and substitute complaint or information. * * * The State may not permit an accused to be hurried to conviction under mob domination. * * * Nor may a State, through the action of its officers, contrive a conviction through the pretense of a trial which in truth was in fact the means used of depriving a defendant of liberty;" and then commented "but the freedom of the State in establishing its policy is the freedom of constitu-

tional government and is limited by the requirement of due process of law;" and concluded: "And the trial equally is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence. The due process clause requires 'that state action, whether through one agency or another; shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.'"

In *Ashcraft* v. *Tennessee,* 322 U.S. 143, 88 L. ed. 1192, a conviction affirmed by the highest court of Tennessee was reversed because of a forced confession. In that case, in commenting upon the fact there was a dispute as to whether the confession was voluntary or involuntary, the court said: "Such disputes, we may say, are an inescapable consequence of secret inquisitorial practices. And always evidence concerning the inner details of secret inquisitions is weighed against an accused, particularly where, as in many other cases, his supposed offense bears relation to an unpopular, economic, political, or religious cause." The court concluded in that case that the confession was involuntary from facts arising outside of what took place in the jail. So in this case, the facts that the sheriff did not deliver his prisoner to the county jail, but to the police station; that the prisoner was denied an attorney, and that his mother and other relatives were not allowed to see him, together with the visible evidences of beatings, are all but exterior evidence of the fact that he was to receive no aid or assistance, nor to confer with anybody until he had complied with the demands of the police.

The *Ashcraft case* was before the Supreme Court on a second occasion, (*Ashcraft* v. *Tennessee,* 327 U.S. 274, 90 L. ed. 667,) after the courts of Tennessee had attempted to evade the ruling of the Supreme Court in the first case, because in the first instance the confession was written up, and in the second trial an attempt was made to use the original oral confession obtained by force and violence.

The cause was again reversed because, as the court said: "the record shows beyond any peradventure of doubt that the testimony used in the last trial showing what took place during Ashcraft's examination might well have had the same practical effect on the jury the written unsigned confession might have had, had it been introduced." This case practically covers the situation here. A written confession was used, but the forced confession has a direct connection owing to the testimony of the chief of police that the defendant, on the night before, admitted participation in the robbery. *Malinski* v. *New York*, 324 U.S. 401, 89 L. ed. 1029, and *Chambers* v. *Florida*, 309 U.S. 227, 84 L. ed. 716, specifically hold that confessions obtained by illegal means are not admissible in evidence, and require a reversal of the State court affirming convictions.

These two last-mentioned cases further hold, upon the question whether there has been a violation of the due-process clause by the introduction of a confession in the criminal prosecution in the State court, that it is one upon which the Supreme Court will make an independent investigation of itself, and if it finds from the evidence and the attendant circumstances that the confession was coerced or compelled, the judgment of conviction will be set aside, even though evidence independent of the confession might justify a conviction. Other cases adopting the same principle have been applied to instances where convictions have been had in the Federal courts by means of confessions obtained in like manner. *McNabb* v. *United States*, 318 U. S. 332, 87 L. ed. 819; *Anderson* v. *United States*, 318 U. S. 350, 87 L. ed. 829; *Buchalter* v. *New York*, 319 U. S. 427, 87 L. ed. 1495.

The latest expression of the Supreme Court is contained in the cases of *Haley* v. *Ohio*, No. 51 October Term, 1947, dated January 12, 1948; and *Lee* v. *Mississippi*, No. 91 October Term, 1947, dated January 19, 1948, in which the Federal cases cited above have been followed, and con-

victions reversed, with but little comment. It is also to be noticed that in all of these Federal cases the mere denial of the officers of the illegal methods employed is not considered conclusive of the voluntary character of the confession, but all of the surrounding facts are examined to determine if the due-process clause has been observed during the trial.

From the foregoing Federal authorities it appears that the State courts, in deciding the admissibility of a confession of crime, must, in addition to complying with its own laws, also enforce the observance of the due-process provision of the United States constitution, as interpreted by the United States courts. To comply with due process, lip service testimony of the persons obtaining the confession, that the same is voluntary, is not sufficient, if surrounding circumstances throw doubt upon its authenticity.

The forms of procedure and practice of the State are no bar to ascertaining the truth, as due process requires that no duress of mind or body shall influence the one who makes the confession. The broad statement is made that the extended interrogation which would not be permitted the officers during the trial of. a cause as a public tribunal likewise could not be conducted secretly where there is no guiding hand to protect the prisoner.

Certainly, it is decided that a confession unlawfully obtained renders one made later, while under the same constraint, and which is apparently voluntary, inadmissible. The effect of abuse, brutality, constant and continued questioning, or third-degree methods in obtaining a confession is held to affect a later one when made in the same place of confinement. As was said in *United States* v. *Bayer,* 91 L. ed. 1294, "Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can

never get the cat back in the bag. The secret is out for good. In such a case, a later confession always may be looked upon as fruit of the first."

We think that the circumstances surrounding the defendant at the time of his confinement in the city jail show without much doubt he was shamefully abused and beaten, and by reason thereof he made the confession of December 3; and when he made the later confession December 4 he was not free from the fear and abuse of the previous· evening. Under the Federal authorities and under the holding in the *Santucci case,* the confession of December 4 was improperly admitted in evidence.

We cannot condemn too harshly the actions of the police for their treatment of the defendant, or of the sheriff for failing in his duty by surrendering Karrick to the police instead of complying with the law. Nor are the prosecuting officials exempt from criticism, for zeal to obtain convictions should not condone failure to get to the bottom of the facts of the confession, when visible violations of the law should have given them notice of what was occurring.

The case of *People* v. *Frugoli,* 334 Ill. 324, pointedly calls attention to section 161 of division I of the Criminal Code, (Ill. Rev. Stat. 1947, chap. 38, par. 379,) which makes it a felony punishable with imprisonment in the penitentiary for two or more to assault and beat, or to imprison another within this State for the purpose of obtaining a confession of crime. Naturally, officers Barkley and Austin could not admit violation of this statute, but the bruised and battered person of Karrick refutes their story of a confession obtained by peaceable persuasion.

In *People* v. *Crabb,* 372 Ill. 347, we held that failure to return the warrant to the magistrate who issued it, and grilling the defendant, were abuse of due process, which, combined with a refusal to permit the prisoner to

confer with counsel or parents, required a reversal of conviction of crime based on a confession obtained by officers while the defendant was in jail.

The court should scrutinize with the utmost care facts concerning an alleged voluntary confession to police officers, and not deem itself bound by their testimony alone, without taking into consideration all of the circumstances surrounding it. We are of the opinion that neither of the confessions in this case was voluntary. We believe that where a confession is unlawfully obtained it taints and renders inadmissible a later one, while the prisoner is confined in the same jail, and under the restraint of the same officers who procured it in the first instance; and that where the sheriff makes an arrest and turns the prisoner over to the police, the reason for so doing must appear to be lawful, and evidence of abuse while in the custody of the police will be deemed strong proof that the surrender was to extort a confession.

The case must be reversed because the evidence shows the court improperly ruled the confession of Karrick was voluntary, and because the defendant did not receive due process of law during the trial.

We have considered the points urged on rehearing by the People and have vacated the order striking the report of testimony. Consequently, we adhere to our original opinion.

The judgment of the circuit court of Madison County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE SIMPSON took no part in the consideration or decision of this case.